# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

|  |  |
|---|---|
| WHEATLAND BANK, | |
| Plaintiff, | |
| v. | No. |
| MICHAEL A. SYKES, ARTHUR P. SUNDRY, JR., EDWARD ELSBURY, and MEZZANINE FINANCE LLC., | |
| Defendants. | |

REDACTED

2009L015546
CALENDAR/ROOM N
TIME 00:00
Other Com Litigation

## COMPLAINT

NOW COMES Plaintiff Wheatland Bank (the "Bank"), by its undersigned attorneys, Vedder Price P.C., and complains against Defendants Michael A. Sykes ("Sykes"), Arthur P. Sundry, Jr. ("Sundry"), Edward Elsbury ("Elsbury"), and Mezzanine Finance LLC ("MFL") (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.     This action involves the collusion of Sykes, Sundry and Elsbury to use their positions as directors, officers and/or shareholders of the Bank to deliberately injure the Bank for their own personal profit and for the financial benefit of their company, MFL. Sykes, Sundry and Elsbury, individually and in collusion with each other, solicited and approved commercial real estate loans that they knew or should have known would not comply with the Bank's lending standards, materially misrepresented these loan transactions to the Bank's Loan Committee and to other directors and officers of the Bank, and made these material misrepresentations in order to induce the Bank to advance loan funds to borrowers who would not have qualified for such loans from the Bank had the truth been known. Sykes, Sundry and Elsbury personally profited from these loans as proceeds were used to pay off mezzanine loans placed by them against the

properties through their separate finance company, MFL. In addition, Sykes, Sundry and Elsbury, individually and in collusion with each other, held MFL out to the Bank's customers as the Bank, thereby causing actual confusion to Bank customers about whom they were dealing.

2. Sykes, Sundry, Elsbury and MFL, individually and in collusion with each other, have breached fiduciary duties owed to the Bank, induced breaches of fiduciary duty to the Bank, engaged in fraud and/or negligence, violated the Illinois Uniform Deceptive Trade Practices Act and conspired with each other to profit themselves at the Bank's expense. Accordingly, the Bank seeks compensatory and punitive damages as well as attorneys' fees and costs to the extent provided by law.

## PARTIES

3. Plaintiff Wheatland Bank is an FDIC insured and Illinois-chartered banking institution founded in or about January 2007. Its principal place of business is located at 2244 W. 95th Street, Naperville, IL 60564.

4. Defendant Sykes is an individual residing at 3636 Breitweiser Lane, Naperville, Illinois, 60564. Sykes was an organizer and is a shareholder of the Bank. From February 7, 2007 until he resigned on June 11, 2009, Sykes was employed by the Bank as its President and Chief Executive Officer ("CEO").

5. Defendant Sundry is an individual residing at 111 Longcommon Road, Riverside, Cook County, IL 60546. Sundry is a shareholder of the Bank. From February 2007 until July 1, 2009, Sundry was on the Bank's board of directors.

- 2 -

6.    Defendant Elsbury is an individual residing at 1787 Chadwicke Circle, Naperville, IL 60540. Elsbury is a shareholder of the Bank.

7.    Defendant MFL is an Illinois limited liability company with its principal place of business at 3636 Breitweiser Lane, Naperville, Illinois, 60564. Upon information and belief, MFL is a limited liability company wholly owned by Sykes, Sundry, and Elsbury.

## JURISDICTION

8.    This Court has personal jurisdiction over all of the defendants under 735 ILCS § 5/2-209 as each is a citizen of Illinois.

9.    Venue in proper in this Court under 735 ILCS §§ 5/2-101(1) because one or more defendants are residents of Cook County.

## ALLEGATIONS COMMON TO ALL COUNTS

### Sykes, Sundry and Elsbury Form and Operate MFL

10.    On or about April 25, 2005, Sykes, Sundry and Elsbury formed MFL to provide mezzanine financing to commercial loan customers. MFL's mezzanine loans provided MFL clients with additional operating capital for their commercial real estate projects.

11.    Upon information and belief, MFL clients had primary loans from banks and similar financial institutions to fund the acquisition and/or development and improvement of real estate. These loans were secured by the real estate being acquired and/or developed.

12.    Sykes, Sundry and Elsbury obtained the funds to loan to MFL customers by borrowing against a line of credit from M&I Marshall & Isley Bank ("M&I Bank"). After MFL funded its mezzanine loans to its customers, MFL assigned any mortgage or assignment of leases

- 3 -

and rents received from its customers to M&I Bank to provide additional collateral for MFL's line of credit with M&I Bank.

13.     Upon information and belief, both the primary commercial loans and MFL's mezzanine loans were for a limited duration, often one year or less, and were to be repaid from the proceeds of the sale or from revenues from the lease of the developed and improved real estate.

## History of the Bank

14.     In or about late 2006, members of the business community in the western suburbs of Chicago decided to form a community-based financial institution located in Naperville, Illinois to provide personal and commercial banking services to individuals and small businesses located in or around Will, Du Page and Cook Counties.

15.     On January 30, 2007, the State of Illinois granted the Bank its charter and the Bank opened its doors for business on or about February 5, 2007.

16.     As a state-chartered bank insured by the Federal Deposit Insurance Company ("FDIC"), the Bank implemented certain policies governing the conduct of its loan officers, loan committee members, and directors.

17.     For example, the Bank implemented a Code of Ethical Conduct Policy that included a conflict of interest policy. This Code of Ethical Conduct provided, among other things, that:

> By accepting a position or affiliation with the Company [Wheatland Bank], each officer, director and employee subscribes to and agrees to this Code of Ethical Conduct.

- 4 -

*     *     *

The standards for honest and ethical behavior for all Covered Persons [an "employee, officer, executive officer and directors of the Company"] include, but are not limited to, the avoidance of conflicts of interest, the prohibition on the misuse of corporate opportunities, the prohibition on the misuse of corporate assets, the preservation of the Company's confidential information and the prohibition of trading on inside information.

*Avoidance of Conflicts of Interest*

- A "conflict of interest" exists, or may exist, whenever a Covered Person's private interests are adverse to, interfere with, or influence the objective judgment and the action of the Covered Person (or appear to do any of the foregoing) with respect to the business interests of the Company. Conflicts of interest may also arise when a Covered Person receives improper personal benefits from any Company action or omission to act which are substantially attributable to such Covered Person's position with the Bank.

- Conflicts of interest are prohibited as a matter of Company policy. To the extent that any Covered Person is or becomes aware of a potential or actual conflict of interest between such Covered Person's interests and the actions or potential actions of the Company, the Covered Person shall promptly report such potential or actual conflict of interest to an Executive Officer with the intended purpose of completing a report to the Company's Board of Directors or to the Vice Chairman of the Executive Committee who has been designated as the liaison between the Bank the Board of Directors. Any Covered Person who becomes aware of a potential or actual conflict of interest with respect to the interest of another Covered Person is also directed to make a report. Any report of a potential or actual conflict of interest may, at the option of the Covered Person making the report, be made directly to the Board of Directors of the Company.

*Prohibition of Misuse of Corporate Opportunities*

- Each Covered Person is prohibited from (i) appropriating for himself/herself or any of his/her affiliates or family member's business opportunities that properly belong to the Company or are discovered by the Covered Person through the performance of duties on behalf of the Company, and (ii) using his/her position for personal gain.

*Prohibition of Misuse of Corporate Assets*

- All Company assets should be used for the legitimate business purposes of the Company only.

- 5 -

18.     The Bank also implemented a Loan Policy. The Bank's Loan Policy provides, among other things that "Under no circumstance shall a loan officer make, fund or vote on a loan to a family relative, to another officer, or any person or business which could be considered a conflict of interest in any way." (emphasis added.)

19.     In addition, the Bank formed a Loan Committee comprised of the Bank's senior executives and directors. The Loan Committee was responsible for evaluating the loan based upon the information provided by the loan Account Officer and deciding whether to approve the loan and any conditions for approval.

20.     The Bank expected its directors and officers to adhere to certain guidelines of conduct promulgated by the FDIC including the FDIC Pocket Guide for Directors and the FDIC Statement Concerning the Responsibilities of Bank Directors and Officers ("FDIC Statement").

21.     The FDIC Pocket Guide for Directors notes, among other things, that "[e]xperience has shown that certain aspects of lending are responsible for a great number of the problems experienced by troubled institutions. The importance of policies and reports that reflect on loan documentation, performance, and review cannot be overstated." It further states that directors and officers should "[a]void all preferential transactions involving insiders or their related interests. Financial transactions with insiders must be beyond reproach. They must be in full compliance with laws and regulations concerning such transactions, and be judged according to the same objective criteria used in transactions with ordinary customers. The basis for such decisions must be fully documented. Directors and officers who permit preferential treatment of insiders breach their responsibilities, can expose themselves to serious civil and criminal liability, and may expose their institution to a greater than ordinary risk of loss."

- 6 -

22. Similarly, the FDIC Statement provides that "[d]irectors and officers of banks have obligations to discharge duties owed to their institution and to the shareholders and creditors of their institutions, and to comply with federal and state statutes, rules and regulations. Similar to the responsibilities owed by directors and officers of all business corporations, these duties include the duties of loyalty and care. <u>The duty of loyalty requires directors and officers to administer the affairs of the bank with candor, personal honesty and integrity. They are prohibited from advancing their own personal or business interests, or those of others, at the expense of the bank</u>." (emphasis added.)

23. As part of its community banking efforts, the Bank is in the business of making loans secured by commercial real estate. Among other things, the Bank loaned money to borrowers to finance the acquisition and/or development of the commercial real estate properties. In addition, the Bank loaned money to borrowers to refinance commercial mortgages granted by other financial institutions.

24. At all times, the Bank expected its loan officers and those charged with authority to approve loans on behalf of the Bank to comply with the Bank's Code of Ethical Conduct, the Bank's Loan Policy, and the conduct guidelines promulgated by the FDIC.

### Sykes's Employment and Director Relationships With The Bank

25. On or about February 7, 2007, Sykes accepted employment with the Bank as the Bank's President and CEO.

26. In addition to serving as the Bank's President and CEO, Sykes served as an Account Officer and member of the Bank's Loan Committee. Sykes was also a member of the Bank's Board of Directors.

- 7 -

27.     As an officer and director of the Bank, Sykes had an affirmative duty to adhere to the conduct guidelines articulated by the FDIC as well as the Bank's policies, including its Code of Ethical Conduct and Loan Policy.

28.     As an Account Officer, Sykes was responsible for the offer and sale of the Bank's commercial loan services to credit-worthy borrowers and ensuring that the proposed loan conformed to the Bank's credit policy.

29.     After evaluating the loan application, if the funds sought exceeded Sykes's approval limits, Sykes presented the potential borrower's loan request and supporting information to the Bank's Loan Committee for approval.

30.     As an Account Officer and as President and CEO of the Bank, Sykes also had individual authority to make loan decisions on behalf of the Bank without prior approval of the Loan Committee.

31.     As a member of the Bank's Loan Committee, Sykes was responsible for evaluating loan requests and deciding whether to extend credit to each loan applicant and upon what terms such credit would be extended.

32.     Sykes had an affirmative duty to disclose any and all business dealings he had with Bank customers that could reasonably be perceived to be a conflict of interest with the Bank's business, including any lender-borrower relationships he had with Bank customers whose loan applications he was considering on behalf of the Bank.

### Sundry's Service as a Director of the Bank

33.     From February 2007 until July 1, 2009, Sundry served as a director of the Bank.

34.     While a director of the Bank, Sundry served on the Bank's Loan Committee.

35.     As a member of the Bank's Loan Committee, Sundry was responsible for evaluating loan requests and deciding whether the Bank should extend credit to each loan applicant and upon which terms it would be extended.

36.     As a director of the Bank and member of the Bank's Loan Committee, Sundry had an affirmative duty to adhere to the conduct guidelines articulated by the FDIC as well as the Bank's policies, including its Code of Ethical Conduct and Loan Policy.

37.     Sundry had the affirmative duty to disclose any and all business dealings he had with Bank customers that could reasonably be perceived to be a conflict of interest with the Bank's business, including any lender-borrower relationships he had with Bank customers whose loan applications he was considering on behalf of the Bank.

## Sykes Operates MFL Out of The Bank With Sundry's And Elsbury's Knowledge And Approval

38.     At all times while Sykes was an employee, president, CEO and director of the Bank, Sykes continued to operate MFL and transacted substantial MFL business out of the Bank's offices during the Bank's business hours.

39.     Upon information and belief, Sykes met with MFL clients at his Bank office during Bank business hours to conduct business on behalf of MFL.

40.     Sykes used his Bank provided desktop computer to email MFL clients and others, including Sundry and Elsbury, concerning MFL business and did so during Bank business hours.

Sykes used both his Bank email address and his personal email account to accomplish these communications.

41.     Moreover, because Sykes's personal email account, wheatland@aol.com, incorporated the Bank's name, it gave the impression that it was actually an official Bank email account.

42.     Sykes also used the Bank's telephones, facsimile machines and other Bank resources to communicate on behalf of MFL and facilitate MFL business.

43.     Among the people with whom Sykes communicated regularly from his Bank office about MFL business were Sundry and Elsbury.

44.     Sykes also communicated with Bank customers and vendors from his Bank office on behalf of MFL.

45.     As a result of these MFL communications from the Bank, Sykes, Sundry and Elsbury were able to secure clients for MFL from the Bank's loan customers.

46.     For example, at least one Bank loan customer who received a commercial loan from the Bank and a mezzanine loan from MFL believed that the Bank had provided both the commercial loan and the mezzanine loan.

**Sykes, Sundry and Elsbury Collude to Injure the Bank for the Benefit of MFL**

47.     From as early as February 2007 through the summer of 2009, when Sykes resigned his employment and terminated his employment agreement and Sykes and Sundry were unanimously de-slated from their positions as directors of the Bank, Sykes, Sundry and Elsbury

- 10 -

have colluded to ensure that MFL would profit from the loans it extended to Bank customers at the expense of the Bank.

### The Customers P Loan[1]

48.     On or about March 7, 2007, Sykes, as Account Officer for the Bank, prepared a loan approval request on behalf of a limited liability company known as Customer A for a loan of $693,750 to purchase two improved residential lots in Naperville, Illinois (the "Customer A Loan Approval Request") to be guaranteed by the husband and wife owners of Customer A (together, the "Customers P").

49.     The aforementioned Customer A Loan Approval Request contained a number of material misstatements and omissions devised by Sykes to ensure that the loan would be approved by the Loan Committee.  For example, the Customer A Loan Approval Request incorrectly noted that the client had been referred to the Bank by Pete Bielby, a shareholder of the Bank.  Pete Bielby, however does not know the borrower and did not refer the borrower to the Bank  Additionally, the Customer A Loan Approval Request failed to state that Sykes' own finance company, MFL, would be providing mezzanine financing to the Customers P at an interest rate well over double the interest rate to be charged by the Bank.  Further, the Customer A Loan Approval Request incorrectly lists Customer A as the borrower, rather than the Customers P.

---

[1] To protect the non-public financial information of Bank customers, the Bank has redacted personally identifying information from this Complaint.  The Bank will move to file a non-redacted version of this Complaint under seal as soon as practicable.

50.     On March 16, 2007, without advising the Bank's Loan Committee, Sykes authorized the Bank's loan to the Customers P and extended directly to the Customers P of $693,750 at initial rate of 8.25% secured by a mortgage on real estate (the "Customers P Loan"). As noted in the Customer A Loan Approval Request, the Customers P were to only be the guarantors of a loan to Customer A.   Although the Customer A Loan Approval Request identified the Customers P's lack of cash flow as a risk to repayment, the 75% loan to value ratio was identified as a mitigating factor.

51.     On the same date the Bank made the aforementioned loan to the Customers P, without advising the Loan Committee or disinterested directors of the Bank, MFL made a loan to the Customers P of $92,500 at a 20% interest rate (the "MFL Customers P Loan").  The MFL Customers P Loan was secured by a second mortgage on the property.  MFL then assigned the mortgage to M&I Bank.

52.     On March 21, 2007, Sykes presented the Customers P Loan to the Loan Committee for Ex Post Facto approval, not as a loan to be approved, but as a name change from Customer A to the Customers P.  Despite Sykes' clear conflict and involvement with the MFL Customers P Loan, Sykes did not disclose to the Loan Committee his personal business relationship with the Customers P or that MFL had approved an additional $92,500 loan secured with a 20% interest rate and secured by a second mortgage on the properties securing the Customers P Loan.

53.     On April 5, 2007, the Bank recorded an Assignment of Rents against the Customers P's property in favor of the Bank.

54.     That same day, MFL recorded a Junior Mortgage and Assignment of Lease and Rents against the Customers P's property in favor of MFL.

55.     The MFL Customers P Loan increased the total encumbrance on the Customers P property from 75% to 85% of its value and increased the Customers P's monthly interest payment obligations.

56.     The Customers P's increased debt servicing obligation also increased the risks to repayment identified by the Bank. Moreover, by increasing the loan-to-value ratio of the two properties to 85%, the MFL Customers P Loan impaired the Bank's strongest mitigating factor against the risk to repayment. Nonetheless, Sykes failed to disclose the MFL Customers P Loan to the Bank and the adverse impact that the MFL loan had on the credit quality of the Bank's loan.

57.     In or about October 27, 2008, Sykes, along with Len Eichas, the Bank's Chief Lending Officer, approved a 90-day loan extension for the Customers P Loan and also reduced the Customers P Loan's interest floor from 7.25% to 6.50%.

58.     Upon information and belief, the October 27, 2008 loan extension and interest rate reduction was granted in response to requests by the Customers P, who were having difficulty making interest payments on both the Bank's Customers P Loan and the MFL Customers P Loan.

59.     Sykes's file memo authorizing the 90-day extension and the interest rate floor of 6.5% misrepresents that there was no interest floor with the original Customers P Loan, thereby creating an impression that, in exchange for the 90-day extension, the Bank received the benefit

- 13 -

of an interest floor on the loan. However, the original Customers P Loan documents expressly include a 7.25% interest rate floor. Thus, the October 27, 2008 loan extension represented a significant concession to the Customers P, both in terms of repayment date and interest rate reduction.

60.     Upon information and belief, Sykes and MFL did not provide any interest rate reduction or other concession to the Customers P with respect to the MFL Customers P Loan at the time Sykes authorized the concessions by the Bank in the October 27, 2008 loan extension.

61.     On or about February 13, 2009, Sykes approved an additional 12-month loan extension and another decrease in the interest rate floor to 5.50%. Sykes's file memo incorrectly states that the Customers P Loan's floor interest rate decreased from 7.25%, however, it actually decreased from 6.5%.

62.     Upon information and belief, this February 13, 2009 extension and interest rate reduction was approved by Sykes in response to additional requests by the Customers P to Sykes for relief as they were having difficulty paying interest on both the Customers P Loan and the MFL Customers P Loan.

63.     Upon information and belief, Sykes and MFL did not provide any interest rate reduction or other concession to the Customers P with respect to the MFL Customers P Loan at the time he approved the concessions by the Bank in the February 13, 2009 loan extension.

64.     Upon information and belief, Sykes's and MFL's dealings with the Customers P led the Customers P to believe that both the Customers P Loan and the MFL Customers P Loan were with the Bank.

- 14 -

65.     On June 25, 2009, the Customers P wrote a letter to the Bank requesting additional relief from the Bank on the servicing of its two loans (the "Customers P Letter"). The Customers P Letter indicated the Customers P's belief that both the Customers P Loan and the MFL Customers P Loan were with the Bank and in particular indicated the difficulty of making payments on the MFL Customers P Loan since it remained at 20%: "I also stated concern about the 2nd Mortgage with [Wheatland] Bank at the stated 20 percent interest rate. … [Y]ou had proposed that The Bank would refinance these notes using the new appraisals. You state that 'half of the 2nd Mortgage would be refinanced under the 1st Mortgage, thus lowering the interest rate on 50% of the 2nd Mortgage.'"

66.     At no time did Sykes or Sundry disclose MFL's financial dealings with the Customers P to the Bank. Nor did Sykes refrain from acting as the Customers P's loan officer at the Bank despite the fact that he and Sundry had a clear conflict of interest due to the MFL Customers P Loan.

67.     The Customers P Loan has since been in default. In late September 2009, the Bank filed an action to foreclose on property securing the Customers P Loan. The Bank's ability to be made whole has been significantly impeded by the existence of the MFL Customers P Loan and mortgage.

### The Customer W Loan

68.     On or about July 24, 2006, Customer V, through his company, Customer G, Inc. ("Customer G"), obtained a $7.75 million mortgage from Mutual Bank secured by three parcels of land. Two parcels comprised a tract of land approximately 9 acres in size (the "9 Acre Tract") and the third parcel comprised a tract of land approximately 50 acres in size of which 40 acres

- 15 -

were buildable (the "40 Acre Tract"). Customer V and Customer G granted Mutual Bank a mortgage against the 9 Acre Tract and the 40 Acre Tract.

69.     At about that same time, Customer G transferred title to the 9 Acre Tract and the 40 Acre Tract to Customer W, LLC ("Customer W"), an Illinois limited liability company wholly owned by Customer G.

70.     Upon information and belief, Customer V and Customer G formed Customer W for the purpose of using the Customer W entity to develop the 9 Acre Tract and the 40 Acre Tract.

71.     On or about November 7, 2006, MFL through Sykes and Sundry loaned Customer W $940,000 at an interest rate of 20% and secured by a second mortgage against the 9 Acre Tract and the 40 Acre Tract in favor of MFL (the "MFL Customer W Loan") that was subordinated to the Mutual Bank mortgage against the two properties.

72.     Thereafter, MFL assigned its Customer W mortgage to M&I Bank.

73.     On or about April 16, 2007, Customer W sold the 40 Acre Tract to a third party. Upon information and belief, Customer W and Customer G disclosed the sale of this property to Mutual Bank and MFL who approved the sale of the 40 Acre Tract.

74.     In or about early December 2007, Elsbury, a shareholder of the Bank and a principal of MFL, referred Customer W to the Bank for a requested loan of $5.4 million to refinance the Mutual Bank loan.

75.     Upon information and belief, the MFL Customer W Loan was past due and Customer W could not repay its loan with MFL. Upon information and belief, Sykes, Sundry and Elsbury recognized that the MFL Customer W Loan presented a significant credit risk to MFL.

76.     Elsbury did not disclose his relationship with MFL, his relationship with Customer V or Customer G, the fact that MFL had a $940,000 loan to Customer W, or the fact that the MFL Customer W Loan was past due to the Loan Committee.

77.     Despite his clear conflict due to the MFL Customer W Loan, Sykes improperly served as the Bank's Account Officer for Customer W. As the Account Officer, Sykes was responsible for compiling the loan approval request and for presenting the loan to the Loan Committee for approval.

78.     In order to obtain a high enough loan-to-value ratio to permit the Bank to loan $5.4 million to Customer W, thereby enabling Customer W to pay off its MFL loan, Sykes directed that the December 7, 2007 loan approval request (the "Customer W Loan Approval Request") utilize the appraised value of the 40 Acre Tract to determine the loan to value ratio even though he knew that Customer W had sold that property approximately 7 months earlier.

79.     Sykes did not order new appraisals for the 9 Acre Tract or the 40 Acre Tract, but rather directed that the Bank's credit analyst use existing appraisals for those two properties. The appraisal for the 40 Acre Tract was 18 months old and, therefore, did not comply with Bank policy, but Sykes did not note that policy exception on the Customer W Loan Approval Request he presented to the Loan Committee.

- 17 -

80.     Although he knew that the 40 Acre Tract had been sold, the Customer W Loan Approval Request presented by Sykes to the Loan Committee misrepresented that the Bank would have a mortgage against the 40 Acre Tract.

81.     Neither Sykes nor Sundry disclosed to the Loan Committee that (a) Elsbury was a member of MFL; (b) Elsbury had a business relationship through MFL with Customer W, Customer V and Customer G; (c) the MFL Customer W Loan was past due; or (d) the 40 Acre Tract had been sold and therefore, the loan-to-value ratio was falsely inflated and the Bank could not use that property as security for the loan.

82.     Neither Sykes nor Sundry abstained from presenting, considering or voting on the Customer W Loan despite their clear conflict and prior business interests in Customer W from the MFL Customer W Loan.

83.     On December 12, 2007, the Bank's Loan Committee approved a loan of $5.4 million with $3.9 million of the proceeds to be used to pay off Mutual Bank, $1.1 million of the loan proceeds to pay off MFL, nominal sums to be used to pay for title costs and other associated closing costs, and the remaining $400,000 to be used to fund an interest reserve account at the Bank to support the loan interest payments during the term of the loan (the "Bank Customer W Loan"). The Loan Committee did not approve any amounts to be paid directly to the borrower.

84.     Rather than use the Bank's in-house, FDIC approved, loan document software, Sykes directed that the Bank's outside attorneys prepare the loan documents.

85.     Upon information and belief, at Sykes's direction, no title work for the 40 Acre Tract was requested by the Bank in anticipation of closing the Customer W Loan. Had Sykes

- 18 -

requested a title search for this 40 Acre Tract, the title search would have revealed that Customer W had previously sold this property and it could not provide any security to the Bank.

86.     Upon information and belief, at Sykes's direction, no loan documents reflecting the Bank's purported security interest in the 40 Acre Tract were drafted in anticipation of Closing the Customer W Loan.

87.     Instead of disbursing the loan proceeds in accordance with the Loan Committee's approvals, Sykes and Sundry permitted the Title Company to disburse $3.7 million to pay off the Mutual Bank loan (instead of $3.9 million), $1,112,546.21 to pay off the MFL Customer W Loan (instead of $1,100,000), approximately $5,208.25 closing costs (instead of zero), and the remaining loan proceeds of $576,669.54 (instead of zero) were disbursed to Customer W, in the care of its attorney. Contrary to the Loan Committee's approvals, no funds were retained by the Bank as interest reserves.

88.     The $576,669.54 payment to Customer W was not disclosed to the Bank's Loan Committee and there is no memo in the loan file explaining why Sykes and Sundry permitted over half a million dollars of the Bank's loan proceeds to go directly to the borrower rather than into an interest reserve account with the Bank as approved by the Loan Committee.

89.     By permitting this $576,669.54 payment to Customer W, Sykes and Sundry substantially increased the Bank's exposure to risk of loss.

90.     Sykes, Sundry and Elsbury personally benefitted by the Bank's loan to Customer W in that they were able to have the MFL Customer W Loan, which was in default, paid in full. MFL was paid the entire principal balance of the MFL Customer W Loan of $940,000, plus more

- 19 -

than $172,000 in outstanding interest and late fees. This personal benefit to Sykes, Sundry, Elsbury and MFL was not disclosed to the Bank or Loan Committee.

91.     On December 26, 2008, Sykes extended the Customer W Loan's maturity date by 90 days to March 26, 2009.

92.     On Jan. 27, 2009, Sykes memorialized his approval of this 90-day extension of the Customer W Loan's maturity date in a file memo.

93.     Upon information and belief, Sykes did not present or discuss this extension with the Loan Committee.

94.     At this time, Customer W has not repaid any principal for the Customer W Loan, the full $5.4 million loan is in default, and the Bank has learned that it has no perfected security interest in the 40 Acre Tract.

### The Customer B Loan

95.     Upon information and belief, in or about October 2006, MFL approved a loan in the amount of $673,000 to Customer B LLC ("Customer B"), an entity owned by and affiliated with Customer G and Customer V.

96.     Upon information and belief, the MFL loan was for the purchase of approximately 6 acres of property in Frankfort, Illinois (the "Frankfort Property") to be used for the development of an office park with four low-rise office buildings.

97.     On March 19, 2008, Sykes convinced the Loan Committee to approve a $5.6 million loan to Customer B to finance the construction of an office building located at the Frankfort Property (the "Customer B Loan").

- 20 -

98.     According to the Customer B Loan Approval Request, the $5.6 million loan amount was based upon an estimated "as completed" value of $7,487,440 which gave it a loan to value ratio of 80%. Sykes used the appraisal for a similar office building constructed by Customer B on another section of the Frankfort Property to reach this estimated value and loan-to-value ratio.

99.     The $5.6 million loan included a hold back of $610,000 to establish an interest reserve for the loan (subject to certain conditions) and to establish the interest reserve of $400,000 for the Customer W Loan which was supposed to have been established with the proceeds of the Customer W Loan.

100.    However, the loan approval request only required Customer V to provide a personal guaranty of only 50% of the loan in contravention of the Bank's Loan Policy, which generally required the Bank to obtain guaranties for 100% of the loan.

101.    On March 27, 2009, as the $400,000 in Customer B loan proceeds used to finance the Customer W Loan's interest reserve account were nearly expended, Sykes authorized a transfer of $240,000 from the Customer B Loan's interest reserve account to the Customer W Loan's interest reserve account. Upon information and belief, this transfer was intended to avoid further scrutiny by the Bank of the Customer W Loan as its interest reserves were depleted.

102.    Sykes did not disclose this $240,000 transfer to the Bank's Loan Committee for approval. Nor is there any document in the loan file indicating that Customer B authorized and approved this transfer.

103.    On May 20, 2009, after Sykes had authorized the $240,000 distribution to the Customer W Loan interest reserve, Sykes sought approval from the Loan Committee for an increase of $784,000 in its loan commitment to Customer B, which increased the loan-to-value ratio to 85%. The Loan Committee approved this request. Upon information and belief, the Loan Committee remained unaware that Sykes had approved the transfer of an additional $240,000 from Customer B to Customer W when it approved this increase to Customer B.

104.    At no time did Sykes disclose that MFL had previously loaned money to Customer B for the purchase of the Frankfort Property or that Sykes and MFL had a continuing business relationship with Customer V and Customer G. Nor did Sykes abstain or recuse himself from presenting, considering or voting on the loan approval request for Customer B.

105.    Since May 2009, the Customer B Loan is in default and no principal has been repaid. In addition, several mechanics liens have been filed against the property.

106.    Upon information and belief, the Customers P, Customer W, and Customer B loans are but representative samples of the loan activities in which Sykes and Sundry participated for the benefit of themselves, Elsbury and MFL at the expense of the Bank.

## CAUSES OF ACTION AGAINST DEFENDANTS

### COUNT I – BREACH OF FIDUCIARY DUTY
**(Against Sykes)**

107.    The Bank incorporates and restates its allegations in paragraphs 1 through 106 as if fully set forth herein.

108.    As a director, officer and key managerial employee of the Bank, Sykes owed the Bank the highest fiduciary duties of loyalty and care.

- 22 -

109.    Sykes breached his fiduciary duties of loyalty and care by, among other things, engaging in the following conduct:

(a)    Utilizing the Bank's resources for the benefit of MFL, including using the Bank's offices, equipment, supplies and personnel to conduct business on behalf of MFL;

(b)    Failing to disclose information critical to the Bank's Loan Committee decision to approve or deny credit;

(c)    Failing to disclose corporate opportunities to the Bank;

(d)    Inducing the Bank to approve loans that it would not otherwise have approved based upon false or misleading information;

(e)    Inducing the Bank to approve loans for amounts and upon terms that it would not otherwise have approved based upon false or misleading information;

(f)    Authorizing changes to loan terms to the prejudice of the Bank and the benefit of MFL;

(g)    Failing to disclose fully and completely the financial benefits to MFL and to Sykes of the Bank's approvals of certain loans to MFL clients;

(h)    Failing to recuse himself from loan decisions for Customer V, the Customers P and others with whom Sykes had business relationships that were in conflict with the Bank's interests;

(i)    Inducing the Bank to disburse loan proceeds in a manner contrary to that approved by the Bank, including allowing substantial sums of cash to be disbursed directly to the borrower when no cash-to-borrower financing had been approved.

110.    As a direct result of Sykes's breaches of his fiduciary duties to the Bank, the Bank has been financially damaged in an amount that has yet to be determined, but that exceeds $50,000.

**WHEREFORE**, Wheatland Bank respectfully requests the Court to enter judgment in its favor on Count I and award it (a) compensatory damages in excess of $50,000; (b) disgorgement from Defendant Michael Sykes of any and all compensation provided to him by Wheatland Bank

- 23 -

while he was in breach of his fiduciary duties; (c) punitive damages; (d) costs and attorneys' fees as permitted by law; and (e) any other just and appropriate relief.

**COUNT II – BREACH OF FIDUCIARY DUTY**
**(Against Sundry)**

111.    The Bank incorporates and restates its allegations in paragraphs 1 through 106 as if fully set forth herein.

112.    As a director of the Bank, Sundry owed the Bank fiduciary duties of loyalty and care.

113.    Sundry breached his fiduciary duties of loyalty and care by, among other things, engaging in the following conduct:

(a)    Utilizing the Bank's resources for the benefit of MFL, including using the Bank's offices, equipment, supplies and personnel to conduct business on behalf of MFL;

(b)    Failing to disclose information critical to the Bank's Loan Committee decision to approve or deny credit;

(c)    Inducing the Bank to approve loans that it would not otherwise have approved based information Sundry knew was false or misleading;

(d)    Inducing the Bank to approve loans for amounts and upon terms that it would not otherwise have approved based upon false or misleading information;

(e)    Authorizing changes to loan terms to the prejudice of the Bank and the benefit of MFL;

(f)    Failing to disclose fully and completely the financial benefits to MFL and to Sundry of the Bank's approvals of certain loans to MFL clients;

(g)    Failing to recuse himself from loan decisions for Customer V, the Customers P and others with whom Sundry had business relationships that were in conflict with the Bank's interests; and

(h)    Inducing the Bank to disburse loan proceeds in a manner contrary to that approved by the Bank, including allowing substantial sums of cash to be

- 24 -

disbursed directly to the borrower when no cash-to-borrower financing had been approved.

114. As a direct result of Sundry's breaches of his fiduciary duties to the Bank, the Bank has been financially damaged in an amount that has yet to be determined, but that exceeds $50,000.

**WHEREFORE**, Wheatland Bank respectfully requests the Court to enter judgment in its favor on Count II and award it (a) compensatory damages in excess of $50,000; (b) disgorgement from Defendant Arthur Sundry, Jr. of any and all compensation provided to him by Wheatland Bank while he was in breach of his fiduciary duties; (c) punitive damages; (d) costs and attorneys' fees as permitted by law; and (e) any other just and appropriate relief.

### COUNT III – TORTIOUS INDUCEMENT OF BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

115. The Bank incorporates and restates its allegations in paragraphs 1 through 114 as if fully set forth herein.

116. As directors of the Bank, Sykes and Sundry each owed the Bank fiduciary duties of loyalty and care. Sykes also owed the Bank fiduciary duties of loyalty and care as an officer and key managerial employee of the Bank.

117. Sykes, Sundry, Elsbury and MFL each knew of Sykes's and Sundry's fiduciary duties to the Bank.

118. Despite this knowledge, Defendants, individually and in collusion with one or more of the others, wrongfully and with the intent to cause, or in reckless disregard of the likelihood that they would cause the Bank harm, induced Sykes and/or Sundry to breach their respective fiduciary duties to the Bank.

- 25 -

119.    As a result of Defendants' tortious inducement of Sykes and Sundry's respective breach of their fiduciary duties to the Bank, the Bank has been damaged in an amount to be determined, but which exceeds $50,000.

**WHEREFORE**, Wheatland Bank respectfully requests the Court to enter judgment in its favor on Count III and award it (a) compensatory damages in excess of $50,000; (b) punitive damages; (c) costs and attorneys' fees as permitted by law; and (d) any other just and appropriate relief.

### COUNT IV – FRAUD
### (Against Sykes and Sundry)

120.    The Bank incorporates and restates its allegations in paragraphs 1 through 119 as if fully set forth herein.

121.    As directors of the Bank, Sykes and Sundry had affirmative duties to disclose and to relay truthfully material facts known to them related to business transactions and loan applications considered by the Bank.

122.    Sykes and Sundry purposefully and willfully misrepresented and omitted, among other things, the following material facts to the Bank:

(a)    Their business relationship with MFL;

(b)    Their and MFL's business relationship with the Customers P;

(c)    Their reasons for approving the interest rate reduction on the Bank Customers P Loan;

(d)    Their and MFL's business relationship with Customer V, Customer G, Customer W, and Customer B;

(e)    The status of the MFL Customer W Loan;

(f)    Customer W's lack of ownership of the 40 Acre Tract;

- 26 -

(g)     The use of proceeds for the Bank Customer W Loan; and

(h)     Their use of the Customer B Loan funds to support the Customer W Loan.

123.    Sykes and Sundry knew that the Bank would rely upon their false representations and material omissions.

124.    The Bank relied on Sykes and Sundry's misrepresentations and omissions to its detriment by, among other things, approving loans without knowing those loans had an unduly high loan to value ratio and a substantially greater risk of loss than disclosed by either Sykes or Sundry to the Bank.

125.    These loans have since defaulted.  These defaults have materially and adversely affected the Bank's loan portfolio and caused the Bank substantial financial losses.

126.    As a direct and proximate result of Sykes and Sundry's misrepresentations and omissions, the Bank has been damaged in an amount to be determined at trial, but which exceeds $50,000.

**WHEREFORE**, Wheatland Bank respectfully requests the Court to enter judgment in its favor and against Defendants Sykes and Sundry on Count IV and award it (a) compensatory damages in excess of $50,000; (b) punitive damages; (c) costs and attorneys' fees as permitted by law; and (d) any other just and appropriate relief.

### COUNT V – NEGLIGENCE
**(Against Sykes and Sundry)**

127.    The Bank incorporates and restates its allegations in paragraphs 1 through 114 as if fully set forth herein.

128.     Sykes and Sundry had affirmative duties to the Bank to perform their responsibilities on behalf of the Bank with due care.

129.     Sykes and Sundry breached their respective duties of care by, among other things, negligently misstating and/or omitting relevant and material information concerning various loan applicants and their relationships to Sykes, Sundry and MFL to the Bank, negligently misrepresenting the purpose, terms and use of proceeds from these loans to the Bank, and negligently failing to recuse themselves from participation in loan decisions where their interests were in conflict with the Bank's interests.

130.     As a direct and proximate result of Sykes and Sundry's negligent conduct, the Bank has been damaged in an amount to be determined at trial, but which exceeds $50,000.

**WHEREFORE,** Wheatland Bank respectfully requests the Court to enter judgment in its favor and against Defendants Sykes and Sundry on Count V and award it (a) compensatory damages in excess of $50,000; (b) costs and attorneys' fees as permitted by law; and (c) any other just and appropriate relief.

### COUNT VI – VIOLATION OF THE ILLINOIS
### UNIFORM DECEPTIVE TRADE PRACTICES ACT 785 ILCS 510/1
### (Against Sykes and MFL)

131.     The Bank incorporates and restates its allegations in paragraphs 1 through 126 as if fully set forth herein.

132.     Sykes and MFL knowingly and intentionally passed off the lending services of MFL as the services of the Bank to Bank customers.

133.     Among other things, Sykes met with MFL clients in his Bank office.

- 28 -

134. Sykes used "Wheatland" in his personal email address and used this email account to contact Bank customers and others on behalf of MFL.

135. As a result of Sykes's and MFL's conduct, one or more Bank customers were actually confused, believing they had received a loan from the Bank when, in fact, MFL had lent them the money.

136. Sykes's and MFL's conduct caused the Bank severe, immediate and irreparable harm, monetary damages and injury.

137. Because Sykes's and MFL's conduct was intentional and malicious, the Bank is entitled to its attorneys' fees and costs.

**WHEREFORE**, Wheatland Bank respectfully requests the Court to enter judgment in its favor and against Defendants Sykes and MFL on Count VI and award it (a) compensatory damages in excess of $50,000; (b) punitive damages; (c) costs and attorneys' fees as permitted by law; and (d) any other just and appropriate relief.

### COUNT VII – CONSPIRACY
### (Against All Defendants)

138. The Bank incorporates and restates its allegations in paragraphs 1 through 126 and 131 through 137 as if fully set forth herein.

139. Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct, as described herein, including, among other things, the various breaches of, and tortious inducements to, breach fiduciary duties and contract, the tortious interference with contract and deceptive trade practices.

CHICAGO/#2017112.1

140.    The intent and purpose of Defendants' conspiracy, and the underlying combination of unlawful acts and misconduct committed by each of the Defendants, was to gain personal financial advantage at the Bank's expense. Defendants each had a personal financial motive and incentive to accomplish the foregoing conspiracy.

141.    Each of the Defendants understood and accepted the foregoing scheme and agreed to do its respective part, as described herein, to further and accomplish the objective to gain an unfair business at the Bank's expense.

,142.    By entering into this conspiracy, Defendants have permitted, encouraged and induced all of the unlawful acts and conduct as described herein.

143.    As a direct and proximate result of Defendants' malicious and willful misconduct, the Bank has suffered and continues to suffer severe, immediate and irreparable harm, monetary damages and injury.

144.    Each Defendant's misconduct was knowing, intentional and reckless and was of such an aggravated character as to warrant the imposition of punitive damages.

**WHEREFORE,** Wheatland Bank respectfully requests the Court to enter judgment in its favor and against all Defendants on Count VII and award it (a) compensatory damages in excess of $50,000; (b) punitive damages; (c) costs and attorneys' fees as permitted by law; and (d) any other just and appropriate relief.

Respectfully submitted,

WHEATLAND BANK

By: _____
　　　　　One of Its Attorneys

Randall M. Lending
Cindy S. Stuyvesant
Vedder Price P.C.
222 North LaSalle Street
Suite 2600
Chicago, IL  60601-1003
(312) 609-7500
Firm ID No. 88200
Dated: December 21, 2009

CHICAGO/#2017112.1